**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

STEVEN ADAY,                     :    Case No. 1:18-cv-405

                               :

          Plaintiff,        :    Judge Matthew W. McFarland

                               :

      v.                      :

                               :

WESTFIELD INSURANCE COMPANY, *et* : 
*al.*,                              :

                               :

         Defendants.      :

---

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT (Docs. 58, 59) AND
GRANTING MOTIONS TO FILE DOCUMENTS UNDER SEAL (Docs. 63, 70).**

---

This case is before the Court on the parties' motions for summary judgment (Docs. 58, 59), Defendants Ohio Farmers Insurance Company's and Westfield Insurance Company's motions to seal (Docs. 63, 70), and the respective responsive memoranda (Docs. 66, 69; 67, 71; 72, 73). For the reasons stated below, Plaintiff Steven Aday's motion for summary judgment (Doc. 58) is **GRANTED**; Defendants' motion for summary judgment (Doc. 59) is **GRANTED**; and Defendants' two motions to seal (Docs. 63 & 70) are both **GRANTED**.

## FACTS

In 2005, Aday was hired to work as a claims specialist for Westfield, a subsidiary of Ohio Farmers. In this role, Aday specialized in handling construction defect claims. In 2010, he was promoted to the position of auto unit leader, where he managed a team of claim representatives. In 2016, Aday transferred to a new role as a casualty litigation

claims specialist, where he handled a "wide variety" of claims regarding "premises liability, construction defect, transportation & cargo, copyright infringement, advertising injury, employment practices liability, employee benefits liability, premises & operations, products – completed operations, as well as motor vehicle accidents." (Doc. 67.) Throughout his twelve-year tenure with the company, Aday resided and worked in Cincinnati, Ohio.

As Defendants admit from the outset, Aday "was a good employee. He was well liked and could have continued working for Ohio Farmers long into the future." (Doc. 59.) However, in April 2017, Aday advised Defendants that he would be moving to Seattle, Washington because his domestic partner had accepted an executive-level position there. Regardless, Aday made clear that he wanted to continue his employment with the Defendants and, preferably, remain in the same position and work remotely from Seattle. Aday's immediate supervisor, Betsy Jones, did not believe that such an arrangement was possible. Defendants' business model disfavored unnecessary travel by plane. And while Aday handled some claims in different states,[1] his position was regional and dealt with claims within the territory of southern Ohio and Kentucky. Nevertheless, Jones informed Aday that she would discuss it with her two higher-level supervisors. Both, however, confirmed that Aday's position was strategically placed in Cincinnati and that he had to be physically located in Cincinnati to perform his essential job functions. Ultimately, management informed Aday that,

---

[1] These other claims arose in Arizona, Colorado, Florida, Georgia, New Mexico, North Carolina, South Carolina, Virginia, and West Virginia.

while he was welcome to continue his role as litigation claims specialist for as long as he

desired, he could not do so while working remotely from Seattle. (Doc. 67-1 at ¶ 18.)

Accordingly, Aday began looking and applying for other positions within the

company that he could do remotely.[2] Jones actively helped in this endeavor.

In July 2017, Sheila Lilly, the Casualty Injury General Liability Leader, posted an

announcement that the company was looking for candidates to fill two vacancies for

unit leader in the Casualty Claims department ("Unit Leader" position). The position

involved leading a team of employees in handling a wide variety of general liability

claims. Aday believed the position was a perfect match for his skillset and experience.

He had handled the same types of claims as a litigation claims specialist and had the

necessary leadership experience from serving as a unit leader in the Auto division.

Perhaps more enticing, the job posting stated that while one of the positions would

service the Midwest and east, the other one "will be in the Western states."[3] (Doc. 41-7.)

Prior to applying, Aday contacted Lilly to see if the job was an option given his

plans to relocate to Seattle. Lilly responded that Aday, "should apply and sell us on

how you can make this work. . . I am trying to be creative and think outside the box. At

the same time, leadership is talking about how we need leaders in an office more often."

(Doc. 41-9 at p. 361.) Knowing the concerns about his anticipated move to Seattle, Aday

_____

[2] Aday initially alleged four failure-to-hire claims for positions he was not chosen for, but abandoned
three of them, leaving only the Unit Leader position at issue. (*See* Docs. 18, 59, & 71.)
[3] The existing accounts were in Minnesota, St. Charles, Denver, and Arizona. (Doc. 49-3.) At the time,
Lilly expected business to "grow out there. [Although] [s]ince then that's kind of changed." (Doc. 49 at
74:2-9.)

came to the interview fully prepared, in Lilly's words, he came "loaded for bear." (Doc. 49 at 99:16-18.) Aday prepared a travel calendar with flight information and presented a map reflecting the airfare from Seattle to the respective offices of his anticipated direct reports. At the end of the interview, Lilly and another interviewer-manager, Jason Bidinger, told Aday he had "hit it out of the park." (*Id*. at 125:4-7.) Bidinger even declared that, among the other candidates for the job, Aday was the "one to beat." (*Id*. at 111:1-17.) Lilly agreed. (*Id*.)

There was significant competition for the two positions as Lilly interviewed 14 applicants. After the interviews, Jodie Hopkins, the National Casualty Claims Leader, told Lilly that she had a hard decision to make. (Doc. 48 at 59:2-19.) In Hopkins's mind, all 14 applicants were highly qualified and more than ten of them were internal candidates. To decide who would be hired, Lilly, along with the others who had assisted in the interviews, conducted a "draft room" where they discussed the pros and cons of each applicant. (Doc. 59-1.) Through that process, Lilly narrowed the candidates down to the top five. Aday was fourth. Although one of the draft room participants stated that Aday was the "[m]ost plug and play, ready to go" candidate, Lilly testified that none of the participants thought he was in the top two. (Doc. 49 at 89:9-12, 45:17-20.) In her notes, the first thing Lily listed under Aday's cons was "Seattle, WA," with a circle around "WA." (Doc. 49-3.)

Ultimately, Lilly did not select Aday for either of the two positions. The successful candidates were Danielle Somogyi and Curt Zito. Lilly believed that Somogyi was the best candidate. (Doc. 49 at 57:10-22.) She had started at Ohio Farmers

4

in 1994 as a claims specialist, moved into structured settlements in 2002, and eventually became the division leader—an executive level position which she held for 11 years. (Doc. 59-1.) Zito, meanwhile, started with Ohio Farmers in 2015 and, prior to that, had more than 20 years of experience in the insurance industry. Moreover, Lilly was responsible for hiring Zito in 2015, where he had worked as one of her direct reports until she rotated positions. Although Zito lived in Toledo, Ohio, Lilly believed that he had some good ideas about how he would approach the leadership role and had a "more creative plan" than Aday that did not require spending unnecessary time and money on travel. (*Id.*)

After finding out he had not gotten the position, Aday decided that it was futile to continue looking for a new job within the company. He submitted an irrevocable request for retirement, officially retired, and moved to Seattle.

In June 2018, Aday filed the present lawsuit and, after amending his complaint, alleges three claims against the Defendants for: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, ("ADEA"); (2) age discrimination in violation of Ohio Revised Code Chapter 4112 ("ORC 4112"); and (3) retaliation in violation of ORC 4112. The age discrimination claims are two-fold; Aday alleges that Defendants violated the ADEA and ORC 4112 by: (1) failing to hire him as Unit Leader; and (2) failing to retain him in his then-current position.

In answering Aday's amended complaint, Defendants assert counterclaims against Aday for (1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*, and Ohio's Uniform Trade Secrets Act

("OUTSA"), O.R.C. Chapter 1333.61, *et seq*., ("trade secret counterclaim"), and (2) breach

of duty of good faith and loyalty ("breach of loyalty"). Defendants allege that, through

discovery, Aday produced several email messages he had sent from his internal

Westfield Group email address to either his personal Gmail account or to a third party's

Gmail account.[4] (Doc. 22 at ¶ 32.) As a result, Defendants ran a full audit of Aday's

Westfield email, which revealed several transmissions that Defendants allege violate

both internal company policy and Ohio law. In total, Defendants allege Aday sent 34

unauthorized emails that contained confidential information or trade secrets. (*Id*.)

Defendants have filed a motion for summary judgment on all of Plaintiff's claims

and Aday has filed a motion for summary judgment on all of Defendants'

counterclaims. These motions are fully briefed and ripe for review. Defendants have

also filed two motions for leave to file under seal. In the first motion, Defendants seek

to file under seal four of the emails Aday sent on the basis that they are protected "trade

secrets." In the second motion, Defendants seek to file under seal notes taken from

Zito's interview. The first motion is fully briefed and the second is unopposed. Both

are thus ripe for review.

## LAW

Courts must grant summary judgment if the record "reveals that there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a

matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed.

_____

[4] One of the emails at issue was sent from Aday's Gmail to his Westfield email.

R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To do so, they must present "significant probative evidence ... on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland,* 585 F.3d 901, 913 (6th Cir. 2009). The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir.2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)).

Because discrimination claims brought under Ohio law require the same analysis as the analogous federal law, the Court analyzes both sets of claims together.[5] Likewise, the requirements for establishing misappropriation of trade secrets are largely the same under Ohio and federal law.[6] The Court will analyze them together as well.

_____

[5] *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (age discrimination claims brought under ORC 4112 "are analyzed under the same standards as federal claims brought under the ADEA.") (internal citations omitted); *Braun v. Ultimate Jetcharters, LLC,* 828 F.3d 501 (6th Cir. 2016) (federal law provides the applicable analysis for reviewing retaliation claims brought under ORC 4112).

[6] *See Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC,* No. 3:19-CV-00966, 2019 WL 5964531, at *5 (M.D. Tenn. Nov. 13, 2019), *aff'd,* 958 F.3d 532 (6th Cir. 2020) ("The requirements for establishing misappropriation of a trade secret are largely the same under the DTSA and the Uniform Act."); *Ukrainian Future Credit Union v. Seikaly,* No. 17–CV–11483, 2017 WL 5665960, at *10 n.11 (E.D. Mich. Nov. 27, 2017) ("The DTSA has a similar trade secret definition to the UTSA and was intended to be substantially similar to the UTSA definition."); *see also* H.R. REP. 114-529 ("While other minor differences between the UTSA and Federal definition of a trade secret remain, the Committee does not intend for the definition of a trade secret to be meaningfully different from the scope of that definition as understood by

7

## ANALYSIS

### I. Defendants' Motion for Summary Judgment

Defendants seek summary judgment on all three of Aday's age discrimination claims: (1) failure to hire, (2) failure to retain, and (3) retaliation. Each is addressed in detail below.

When a plaintiff relies on circumstantial evidence to prove age discrimination under the ADEA—as Aday does here—courts "use the familiar *McDonnell-Douglas* burden-shifting framework." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015). Under this three-step analysis, the plaintiff must first show a prima facie case of discrimination. If the plaintiff can do so, then the defendant must articulate a nondiscriminatory reason for its action. If the defendant does, then the plaintiff must "prove that the given reason is pretext for discrimination." *Ford Motor,* 782 F.3d at 767. If the plaintiff cannot do so, summary judgment is warranted.

### A. Failure to Hire

#### 1. Plaintiff's Prima Facie Case and Defendants' Legitimate, Non-Discriminatory Explanation

In a failure-to-hire case, a plaintiff can establish a *prima facie* case of age discrimination by showing that: (1) plaintiff is a member of a protected class; (2) plaintiff was objectively qualified for the particular position; (3) plaintiff was considered for but denied the position; and (4) the selectee is an individual outside of plaintiff's protected class. *See Bartlett v. Gates*, 421 F. App'x 485, 488 (6th Cir. 2010) (citation

---

courts in States that have adopted the UTSA.").

omitted).  The plaintiff's burden at this stage is "not onerous" and "poses a burden
easily met."  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (*citing
Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Aday has satisfied this burden.  He was 63-years old at the time and thus a
member of a protected class under the ADEA.  *See* 29 U.S.C. § 631 (covering persons
over 40).  He was clearly qualified for the positions, as demonstrated by how well he
performed during the interview process: he was deemed one of the top four candidates
amongst a highly qualified field of applicants.  Yet ultimately, he was not chosen for
either position, which were instead filled by two individuals that Plaintiff alleges—and
Defendants do not dispute—were "substantially younger" than Aday.

The burden thus shifts to the Defendants to articulate a legitimate, non-
discriminatory reason for their hiring decision.  And here, Defendants have proffered
such a reason: "Danielle Somogyi and Curt Zito were the top two candidates… both
had numerous positives Aday could not match, and neither had the same negatives as
Aday."  (Doc. 71.)  This is a legitimate, nondiscriminatory explanation that justifies
Defendants' hiring decision.  *See, e.g., Benn v. Peake*, No. 1:07-cv-854, 2010 WL 5691647,
at *5 (S.D. Ohio Dec. 27, 2010) ("The fact that the panel chose the top candidates based
upon their subjective evaluations following the candidates' interviews does not mean
that the Defendant's failure to hire Plaintiff was driven by age discrimination.") (citing
*Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2008) ("[Q]uestioning [the
decision-maker's] hiring criteria is not within the province of this court, even if [the

9

decision-maker's] hiring process was entirely subjective."). Accordingly, Defendants have satisfied their burden under the second step of *McDonnell-Douglas* analysis.

### 2. Pretext

Because Defendants have provided a legitimate, non-discriminatory reason for their hiring decision, they are entitled to summary judgment unless Aday can rebut their explanation by demonstrating pretext. *See Bartlett v. Gates*, 421 Fed. Appx. 485, 488 (6th Cir. 2010). Pretext is generally established by showing that the stated reason for the employer's decision is "false" or "unworthy of credence." *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 135, 143 (2000); *see also Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.").

Plaintiffs usually demonstrate pretext by showing that an employer's stated reason for an adverse employment action either: (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *See Bartlett*, 421 Fed.Appx. at 490-91. The Sixth Circuit has also held that, in the failure-to-hire context, the relative qualifications of the applicants can establish a triable issue of fact as to pretext. *Id.* Under this "relative-qualifications test," to escape summary judgment, a plaintiff must present evidence demonstrating that either: (1) the plaintiff was the "plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former," or (2) the plaintiff "was as qualified as if not better qualified" than the successful applicant, and the record

contains "other probative evidence of discrimination." *Id.* (citations omitted); *see also Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 266 (6th Cir. 2019). Here, Aday argues both.

### (i) "Plainly Superior Candidate"

In order to show that he was "plainly" more qualified than Somogyi or Zito, Aday "must objectively demonstrate his superior qualifications." *Artis v. Finishing Brands Holdings, Inc.*, 639 F. App'x 313, 320 (6th Cir. 2016) (*citing Provenzano,* 663 F.3d at 806). In making such a determination, courts must avoid "acting as a 'super personnel department,' overseeing and second-guessing employers' business decisions." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006) (citations omitted). "If two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the others." *Id.* at 628. And "when qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext,"—as is the case here—"the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." *Id.* at 627.

Aday attempts to show he was the "plainly superior candidate" in two ways. First, Aday argues that his prior experience with a "wide variety" of claims made him the most "plug-and-play, ready-to-go" candidate on day one. However, this assertion is not supported by the record, which shows that Somogyi and Zito had at least equivalent experience handling the same type of claims as Aday, if not more. (*Compare* Doc. 41 at 33:16-24:12, *with* Doc. 53 at 28:19-29:24 *and* Doc. 55 at 47:7-49:22.) All three

11

had experience handling bodily injury claims, including auto injury claims; premises liability claims; and construction claims. But Somogyi also had experience handling transportation and cargo, advertising, and products liability claims, while Zito had also handled transportation, operations liability, and products completed claims. (*Id.*)

Furthermore, even if Aday had more relevant experience, multiple executives testified that the primary focus of the job was leadership skills, not technical skills. (Doc. 48 at 46:18-47:2; Doc. 43 at 18:1-14.) In this regard, Aday was the plainly inferior candidate. Somogyi, who worked for Ohio Farmers for 23 years, had eleven years of leadership experience as the division leader (an executive-level position) of a wholly owned subsidiary of Ohio Farmers. Zito had 19 total years of leadership experience: two years with Ohio Farmers, and 17 more with two other insurance companies, including as branch manager and casualty claims manager. In comparison, Aday had been with Ohio Farmers for twelve years and had only six years of leadership experience in the Auto Claims unit. The evidence thus shows that Aday's prior work experience did not, in fact, make him the "plainly superior candidate."

Second, Aday contends he was the "plainly superior candidate" relative to Zito because he was a resident of Toledo, Ohio. Aday thus argues that living in Seattle made him more qualified to service "western States." But, as Defendants point out, this is not necessarily true. The position was based out of Ohio Farmers' Minneapolis office and serviced Minnesota, St. Charles, Denver, and Arizona. Apart from Arizona, all of these locations are geographically closer to Toledo than they are to Seattle. Moreover, Zito worked out of Ohio Farmers' Toledo office while, in contrast, Aday would have worked

12

from Seattle by himself and entirely remote.  And while Aday's interview revolved around the relative costs of airfare to and from Seattle, Zito stressed the use of technology and methods that would save money.

Not only have the Defendants proffered substantial evidence demonstrating why they believed Somogyi and Zito were the two most qualified candidates, but the Sixth Circuit has repeatedly stated that "it is inappropriate for the judiciary to substitute its judgment for that of management."  *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (citations omitted).  Aday's "subjective view of [his] qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination."  *Id.*

And regardless, even if Aday could prove he had better work experience and lived in a superior geographic location, neither of these credentials satisfy the Sixth Circuit's demonstrably high standard of a "plainly superior candidate."  The Sixth Circuit's decisions in *Bartlett*, 421 Fed.Appx. 485, and *Provenzano*, 663 F. 3d 806 are particularly instructive on this point.  In *Bartlett*, the Sixth Circuit refused to qualify the plaintiff as a "plainly superior candidate" even though she had more years of relevant experience (24 years compared to eight), possessed superior educational credentials (a bachelors degree and graduate degree coursework in business administration, accounting, and law compared to not having graduated from college), and had arguably better communication skills.  421 Fed.Appx. at 486, 491.  In *Provenzano*, the Sixth Circuit held that the evidence failed to show the plaintiff was the "plainly superior candidate" even though she had an associate's degree, the chosen candidate

13

had failed to receive their high school diploma, and the qualifications for the position required "a high school diploma, with a college degree plus." 663 F.3d at 320.

In sum, Aday fails to demonstrate that he was the "plainly superior candidate." All three candidates were highly qualified for the position, which is why Lilly was faced with such a tough decision in the first place.

### (ii) "As Qualified" and "Other Probative Evidence of Discrimination"

Aday can still raise a genuine issue of material fact if he can establish that (1) he "was as qualified as if not better qualified" than the successful applicants, and (2) the record contains "other probative evidence of discrimination." *Bartlett*, 421 Fed.Appx. at 490-91. Although Aday cannot demonstrate that he was the "plainly superior candidate," the record indicates that he was certainly "as qualified as if not better qualified" than Somogyi and Zito. Aday had twelve years of experience with the company, six of which he served in a leadership position. And both sides agree that he was a good employee. All of these factors contributed to why the draft room ranked him fourth out of fourteen "highly qualified" applicants.

Because he was "as qualified" as Somogyi and Zito, the question thus turns on whether the record contains "other probative evidence of discrimination." *See Horn v. City of Cleveland*, 674 F. App'x 511, 517 (6th Cir. 2017) (such "other probative evidence of discrimination" includes "evidence of a workplace permeated with frequent degrading remarks.").

Although Aday does point to other evidence contained in the record, none of it is probative as to whether Defendants' hiring decision had anything to do with Aday's

14

age. Again, Aday attempts to call into question Defendants' decision to hire Somogyi and Zito. But these arguments are unavailing for the reasons articulated above. Next, Aday points to two comments made by other employees. The first comment was made by in the summer of 2016 by Robert Bowers, the National Claims and Customer Service Leader. During a conversation in the lunchroom about other employees who had recently retired, Aday's colleagues began discussing who might retire next. Bowers allegedly pointed at Aday and stated, "this one is up," or words to that effect. But this comment fails in demonstrating pretext for various reasons. First, it was made a full year before the Unit Leader vacancy was even announced. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (comments made eight months before layoff, such as being "too old," are too abstract, irrelevant, and prejudicial to support a finding of age discrimination). Second, Bowers was not involved in the Unit Leader hiring decision. *See Geiger v. Tower Auto.*, 579 F.3d 614, 620–21 (6th Cir. 2009) ("Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination.") And third, Lilly testified that Bowers actually went out of his way to help Aday by letting it be known that he hoped Aday would be hired for the Unit Leader position. *See Savage v. Gee*, 665 F. 3d 732, 739 (6th Cir. 2012) (employee failed to demonstrate discrimination when he received support from his supervisors).

The second comment was made by Terry Neumeyer, who allegedly told Aday that "he did not get the job because '[e]veryone thinks it's time for you to put up your piggies, relax [and let] your wife be the breadwinner." (Doc. 41 at 104:13-21.) Aday alleges that Neumeyer came across this information because he "worked at Westfield's

home office where top executives like Bowers also worked." (Doc. 67.) Neumeyer, however, testified that he never had any conversations with Bowers or any member of management regarding Aday at any point in 2017. And, in Neumeyer's opinion, he was merely wishing Aday well. Neumeyer testified that after Aday told him that he was moving to Seattle, he wished Aday well and told him "he could kick his piggies up and enjoy the rest of his life." (Doc. 51 at 13:12-14:9.) The timing and context of Neumeyer's comment thus diminish its probative value.

Aday's final argument in support of pretext is that Lilly, herself, was motivated by age animus in not hiring Aday. Aday argues that because "she wanted to hire a unit leader who could then replace her in her job in 'two to five' years and assumed Mr. Aday, at age 63, would soon retire from the company." (Doc. 67.) But this argument is purely speculative—at best—and is not supported by evidence. In support, Aday cites Lilly's deposition. However, the cited portion shows that Lilly merely testified that she hoped to have a new position in two to five years, especially in light of Westfield's emphasis on development and future leadership. (Doc. 49 at 21:25-23:11.) In fact, Lilly later testified that, when making her decision, she had no concerns about whether Aday would retire or not be with the company in two to five years, even though Aday flatly told her that he planned on doing so. (*Id.* at 108:20-109:15.)

In sum, all the "other evidence" Aday points to is insufficient in demonstrating pretext. As the Sixth Circuit has stated, "an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Miles v. S. Cent. Human Res. Agency,*

16

*Inc.*, 946 F.3d 883, 886 (6th Cir. 2020) (internal citations omitted). And here, there is no evidence that indicates Defendants' decision to hire Somogyi and Zito had anything to do with Aday's age.

### B. Failure to Retain

Defendants also argue that summary judgment is warranted as to Aday's second claim for relief—that by failing to retain Aday in his then-current role, Defendants deprived him of his employment because of his age. Specifically, Defendants contend that "Aday has no valid evidence to establish the essential elements of his age-discrimination claims" because: (1) Aday voluntarily retired, and (2) Defendants made a legitimate business decision that his position could not be done remotely from Seattle.

In order to make his *prima facie* case under the first prong of *McDonnell-Douglas*, Aday must demonstrate that he suffered an adverse employment action. *See Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 704 (6th Cir. 2016). Yet when an employee voluntarily retires, they cannot make such a claim. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999). A plaintiff can, of course, allege that their resignation or decision to retire was not voluntary by demonstrating a claim for constructive discharge. *See Green v. Brennan*, 136 S. Ct. 1769, 1776, 195 L. Ed. 2d 44 (2016). But here, it is undisputed that Aday voluntarily retired. And Aday does not allege that his decision to do so was a "constructive discharge."

Rather, Aday alleges that Defendants never game him a "solid answer" as to whether he could work remotely from Seattle. The evidence, however, refutes this allegation. In his own Amended Complaint, Aday admits that his direct supervisor,

17

"Betsy Jones, advised [him] that if he moved to Seattle he could not keep his current job." (Doc. 18 at ¶ 13.) Aday further admits that, "ultimately management communicated [ ] that he could not continue in the role of litigation claims specialist living in Seattle." (Doc. 67-1 at ¶ 18.) Jones also advised him that he could continue in his then-current role "in Cincinnati for as long as he desired." (Doc. 57-2 at ¶ 15.) Instead, Aday voluntarily decided to move to Seattle and retire. By doing so, he now cannot make out a *prima facie* case of age discrimination. *See, e.g., Hammon*, 165 F.3d at 447; *Waltherr-Willard v. Mariemont City Sch.*, 2014 WL 347027, at *8 (S.D. Ohio Jan. 30, 2014), *aff'd*, 601 F. App'x 385 (6th Cir. 2015).

## C. Retaliation

Aday claims that Defendant Westfield's pursuit of its trade secret counterclaims constitutes unlawful retaliation. Defendants, however, contend that this argument is insufficient to establish a *prima facie* case of retaliation because: (1) filing the counterclaims does not constitute as an adverse employment action; and (2) there is no causal connection between the filing of the counterclaim and Aday's protected activity.[7]

In order to determine that the filing of a counterclaim qualifies as an adverse employment action, the Court must find that: (1) Westfield "acted with retaliatory motive," and (2) Westfield's counterclaims "lack[ ] a reasonable basis in fact or law."

---

[7] To establish a *prima facie* case of retaliation under O.R.C. 4112, a claimant must prove that (1) he engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action. *Greer–Burger v. Temesi*, 116 Ohio St.3d 324, 327, 879 N.E.2d 174 (Ohio 2007) (*citing Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)).

*Lynch v. Studebaker*, 2007-Ohio-4014, ¶ 20 (8th Dist.), *cause dismissed,* 115 Ohio St. 3d 1480, 875 N.E.2d 964, 2007-Ohio-5937, ¶ 20 (*quoting Nestle Ice Cream Co. v. N.L.R.B.*, 46 F.3d 578, 585 (6th Cir. 1995)). "The fact that an employee files a charge of discrimination does not immunize such employee from suit brought by the employer, provided that the employer's motivation is not one of retaliation." *Rosania v. Taco Bell of Am., Inc.*, 303 F. Supp. 2d 878, 888 (N.D. Ohio 2004). Moreover, the Seventh Circuit has stated that "[w]e hasten to add, however, that it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation prohibited by these statutes." *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998).

Although discussed in more detail below, the Court finds that Westfield's counterclaim has a reasonable basis in fact and law and that Aday has failed to demonstrate sufficient evidence of a retaliatory motive. As such, Aday cannot show that the filing of Defendants' counterclaims amounts to an adverse employment action. Accordingly, Aday has failed to demonstrate a *prima facie* case of retaliation, entitling Westfield to summary judgment on Aday's retaliation claim.

## II.  Plaintiff's Motion for Summary Judgment

Likewise, Aday argues that he is entitled to summary judgment on both of the Defendants' counterclaims for: (1) misappropriation of trade secrets, and (2) breach of duty of good faith and loyalty. Each is discussed in detail below.

### A.  Misappropriation of Trade Secrets

"In order to prevail on a misappropriation-of-trade-secret claim, [the alleging party] must show by a preponderance of the evidence: (1) the existence of a trade secret;

(2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019) (*quoting Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)). Aday contends that he is entitled to summary judgment on Defendants' misappropriation of trade secrets counterclaim because Defendants cannot establish the first and third elements—the existence of a trade secret and unauthorized use. Each argument is discussed below.

### 1. Existence of a Trade Secret

Under Ohio law, a "trade secret" is defined as "information" that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1333.61(D); *see also Handel's*, 765 Fed. Appx. at 122.

In addition, the Ohio Supreme Court has articulated six factors to consider in determining whether an item constitutes a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the

amount of time and expense it would take for others to acquire and duplicate the information. *Id*. (*citing State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 687 N.E.2d 661 (1997)). Although no factor is dispositive, the Ohio Supreme Court has emphasized that "[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status." *State ex rel. Plain Dealer*, 80 Ohio St.3d at 525. Moreover, "the Supreme Court's language suggests that the *Plain Dealer* factors are advisory, to be used to the extent they are applicable, to assist the trial court and factfinder . . . it is ultimately the statute that controls the analysis, not the factors. *MNM & MAK Enterprises, LLC v. HIIT Fit Club, LLC*, 2019-Ohio-4017, 134 N.E.3d 242, 249, ¶ 24 (10th Dist.) (*citing State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 732 N.E.2d 373 (2000)).

Defendants contend that, in total, Aday sent 34 emails that contain alleged trade secrets. However, Defendants already filed two of these emails in the Court's docket. (Doc. 41-12 at p.65-69—September 4, 2017 email titled "FW: MERELY A THOUGHT…"; at p. 91-93— September 20, 2017 email titled "Mid-Year Status Report.") These emails were not filed under seal (nor are they the subject of either of Defendants' two pending motions to seal) and are already part of the public record in this case. As the Sixth Circuit, applying Ohio law, has held, "disclosure . . . absent a confidential agreement or understanding, will destroy any protection of that information as a trade secret." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 411 (6th Cir. 2013) (*citing Columbus Bookkeeping & Bus. Servs., Inc. v. Ohio State Bookkeeping, LLC,* No. 11AP-227, 2011 WL 6938340, at *4 (Ohio Ct.App. Dec. 30, 2011)). These two emails

21

cannot qualify as trade secrets because they have already been disclosed to the public. Importantly, the September 4, 2017 email titled "FW: MERELY A THOUGHT …" is the only email that was sent to a third-party; all remaining emails were only sent from Aday's Westfield email to Aday's personal Gmail, or vice-versa.

Of particular importance are the four emails subject to Defendants' first motion to seal. (Doc. 63.) These four emails, along with a brief description, are listed below:

(1) Email dated 2016 Jan 6 20:20:14 (subject "FW: W-9 list") contained multiple messages containing different views of a very large spreadsheet with lists of Westfield's customers, their addresses and other identifying information (hereinafter, "FW: W-9 list email");

(2) Email dated 2017 Sep 20 22:44:13 (subject "FW: Draft of ROR EZ Breathe") contained a draft memo regarding details of a claim in litigation (hereinafter, "ROR EZ email");

(3) Email dated 2017 Sep 22 16:15:57 contains a document from the Claims Reference Library titled "2017-18 USLAW NETWORK State Judicial Profiles by County.pdf". This copyrighted document was prepared by USLAW Network, Inc. for their members and clients. Mr. Aday is not a member or client in his personal capacity (hereinafter, "USLAW email"); and

(4) Email dated 2017 May 23 16:02:19 contains an image of a signed release in a claim matter sent from Mr. Aday's personal Gmail account to his Westfield email address (hereinafter, "Signed Release email").

As a preliminary matter, the Court finds that all four emails are the "subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." O.R.C. § 1333.61(D)(2). As described in more detail in their response in opposition (Doc. 66), Defendants have numerous safeguards in place to protect proprietary and confidential information contained in employees' emails. Among other things, Defendants use various technology controls to prevent outsiders from accessing its information:

employees operate on a secure server and have required passwords that must be changed every 60 days; firewalls ensure that servers and systems are secure; two different secure email facilities are used; employees must use encrypted email for confidential documents; and Defendants have an information-security department that conducts monitoring to protect against internal hacking. Defendants also conduct employee training and has policies regarding employee's obligations to keep information secure, including their employee handbook.

The question thus turns on whether each email derives independent economic value from not being generally known to the public or those outside of the business. O.R.C. § 1333.61(D)(1). After conducting an *in camera* review of the four emails, the Court makes the following findings.

First, the FW: W-9 list email, which contains an 86-page list of Westfield customers, their addresses, and other identifying information, qualifies as a protected trade secret under Ohio law. *See Boehm v. Black Diamond Casino Events, LLC*, 2018-Ohio-2379, 116 N.E.3d 704, 707–8 (1st Dist.) (*quoting State ex rel. Lucas Cty. Bd. of Commrs. v. Ohio Environmental Protection Agency*, 88 Ohio St.3d 166, 724 N.E.2d 411 (2000) ("A customer list is an intangible asset that is presumptively a trade secret when the owner of the list takes measures to prevent its disclosure in the ordinary course of business to persons other than those selected by the owner.").

Second, the ROR EZ email, which contains a draft memo regarding details of a claim in litigation, is a protected traded secret. It contents likely derive independent economic value as an example of how Defendants handle reservation-of-rights issues.

23

The email also contains identifying information of the parties to the claim.

Third, the USLAW email is not a protected trade secret because Defendants have failed to establish how its contents derive independent economic value unique to Defendants. This email contains a "State Judicial Profile by County" prepared by USLAW Network, Inc., which can be accessed by anyone who pays for a subscription. The USLAW email thus contains information that is accessible to anyone outside of the business who is willing to pay and is a summary/compilation of information that is already known to those inside the business.

Fourth, the Signed Release email is also a protected trade secret under Ohio law. It contains a picture that documents the settlement and final resolution of an insurance claim. Keeping the terms of Defendants' insurance claim settlements confidential is of great value to both the Defendants and its insured, and Defendants go to great lengths to prevent competitors from access such information.

As to the remaining 28 emails at issue, the Court will presume, without definitively finding, that they qualify as "trade secrets" under the DTSA and OUTSA.

**2. Unauthorized Use of Trade Secret**

Under O.R.C. § 1333.61, "misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

24

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

In interpreting this statute, the Sixth Circuit has held that "[f]inding liability under the OUTSA requires *misappropriation* of a trade secret—acquisition by improper means, disclosure, or use…" *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 709 (6th Cir. 2015) (emphasis in original). And while Ohio law does not require that a party suffer actual harm in order to secure injunctive relief, the moving party "needs to demonstrate actual misappropriation of trade secrets to win at trial." *Polymet Corp. v. Newman*, No. 1:16-CV-734, 2016 WL 4449641, at *4 (S.D. Ohio Aug. 24, 2016); *see also State v. City of Cincinnati Citizen Complaint Auth.*, 2019-Ohio-5349, ¶ 26-29, 139 N.E.3d 947, 955 (1st Dist.), *appeal not allowed sub nom. State v. Cincinnati Citizen Complaint Auth.*, 2020-Ohio-1634, ¶ 26, 158 Ohio St. 3d 1488, 143 N.E.3d 530. Accordingly, at this stage of litigation, Defendants must raise a genuine issue of material fact as to whether the trade secrets were either: (1) acquired by improper means, (2) disclosed, or (3) used. O.R.C. § 1333.61(B).

Defendants do not contend that Aday ever "used" the trade secrets. And, the only trade secret Defendants allege Aday ever truly "disclosed" was the September 4, 2017 email titled "FW: MERELY A THOUGHT," which Aday forwarded to his wife.

But as discussed above, this email cannot qualify as a trade secret because Defendants already disclosed it publicly. As to the remaining emails, Aday has adamantly asserted that he never shared them with anyone. It does not appear that Defendants dispute this, nor have they provided any evidence to the contrary. Rather, Defendants argue that Aday "disclosed" the trade secrets by sending the emails through Gmail's unsecured network. But this argument is unavailing, especially because Defendants never allege that Aday's Gmail account was ever compromised. *See PPS Serv. Grp., LLC v. Eckert*, No. 1:18-CV-727, 2019 WL 3927232, at *4 (S.D. Ohio Aug. 20, 2019) (trade secrets were not misappropriated when defendant forwarded emails from his work account to his private account "in order to have access to them at home if a business question arose"); *Dayton Superior Corp. v. Yan*, No. 3:12-CV-380, 2013 WL 1694838, at *17 (S.D. Ohio Apr. 18, 2013) (defendant emailing customer and price lists to himself because he needed it for work "was not improper").[8]

Defendants' trade secret counterclaim thus hinges on whether Aday acquired any of the emails through improper means. Under Ohio law, "improper means" is defined "to include theft, bribery, misrepresentation, breach or inducement of a breach

_____

[8] Although Courts have found that emailing documents to a personal email address may justify a preliminary injunction for "threatened harm" of misappropriation under the "inevitable disclosure rule," to qualify, the former employee must have "begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Proctor & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 747 N.E.2d 268, 279 (Ohio Ct.App.2000). *See, e.g., The Rightthing, LLC v. Brown*, No. 3:09 CV 135, 2009 WL 249694, at *9 (N.D. Ohio Feb. 2, 2009) (emailing documents to personal email address constituted "threat of harm" of misappropriation—under preliminary injunction analysis—because (1) defendant sent the documents right before leaving the company and (2) immediately began working for a competitor). But here, Aday never began working for a competitor, he simply retired.

of a duty to maintain secrecy, or espionage through electronic or other means." O.R.C.

§ 1333.61(A). As such, Defendants argue that Aday breached a duty to maintain secrecy

when he "violated numerous established Westfield policies" by sending the alleged

trade secrets to or from his personal email account.

This argument fails, however, for two reasons. First, Defendants fail to cite a

single Westfield policy that Aday actually violated. Although Aday admits that he

attended an online training course in which the company "admonished" employees to

not "use personal email for Westfield business," Westfield's employee handbook does

not prohibit sending work-related emails to employees' personal email accounts. (Doc.

52 at 17:10-15; Doc. 63.) Moreover, Westfield's Corporate Privacy Officer testified that,

apart from the online training, he was not aware of any kind of document where

employees were directed not to send work-related emails to their personal email

account. (*Id.* at 21:20-22:3.) And, as to any prohibition of sending emails *from* personal

accounts *to* Westfield accounts, Defendants admit that "[t]he training is not very good"

and that it is "a source of weakness for Westfield." (Doc. 52 at 59:4-9.)

Second, there is no evidence that Aday ever allowed anyone else to see the

remaining emails at issue. Defendants testified that, apart from sending these emails to

himself, they were not aware of Aday sharing them with anyone or even "doing

anything improper." (*Id.* at 46:5-13, 48:1-10, 52:21-53:8, 65:1-66:1.) Defendants cannot

establish that Aday breached any duty of secrecy since Aday never shared them with

anyone. And, other sister courts have held when analyzing Kentucky's identical trade

secret statute, "mere possession of an otherwise protected trade secret without any use

does not constitute misappropriation within the meaning of the UTSA." *Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, 226 F. Supp. 3d 828, 856 (W.D. Ky. 2016) (*citing Van Winkle v. HM Ins. Grp., Inc.*, 72 F.Supp.3d 723, 736–37 (E.D. Ky. 2014)). *See also, e.g., Eckert*, 2019 WL 3927232, at \*4; *Yan*, 2013 WL 1694838, at \*17.

Because Defendants have failed to show that Aday ever used, disclosed, or acquired the trade secrets through improper means, they cannot prove the necessary element of "unauthorized use." Accordingly, Aday is entitled to summary judgment on Defendants' trade secret counterclaim.

## B. Breach of Duty of Good Faith and Loyalty

Aday also argues that he is entitled to summary judgment on Defendants' common-law breach of duty of good faith and loyalty claim ("breach of loyalty") because it is preempted by the OUTSA. The Sixth Circuit has held that "the OUTSA should be understood to preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets." *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015). "The test to determine whether a state law claim is displaced by OUTSA is to determine whether the claims are no more than a restatement of the same operative facts that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Id*. at 485 (internal citations omitted). But "[w]here the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, the portion of the claim supported by an independent factual basis survives preemption." *Id*. (citations omitted).

28

Defendants' allege that "Aday breached his duty of good faith and loyalty by misappropriating Westfield's trade secrets, transmitting confidential and proprietary information to his personal email address and to a third party, and violating several express written policies." (Doc. 21 at ¶ 76.) Because this is a restatement of the exact same operative facts as Defendants' claim for trade secret misappropriation, Defendants' breach of loyalty claim is therefore preempted under the OUTSA. *See, e.g., Office Depot, Inc. v. Impact Office Prod., LLC*, 821 F. Supp. 2d 912, 922 (N.D. Ohio 2011); *Int'l Paper Co. v. Goldschmidt*, 872 F. Supp. 2d 624, 635 (S.D. Ohio 2012). And contrary to Defendants' assertion, there is no "factual basis independent from the facts establishing the OUTSA claim" that would warrant partial preemption. *Quoting Stolle Mach. Co.*, 605 F. App'x at 485. Accordingly, Aday is also entitled to summary judgment on Defendants' breach of loyalty counterclaim.

## C. Preliminary and Permanent Injunction

Defendants also argue that they have a statutory right to injunctive relief to address Aday's "misappropriation." Yet, it is well known that a movant must demonstrate a "strong likelihood of success on the merits" to be entitled to a preliminary injunction and "actual success on the merits" for a permanent injunction. *See Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012). Because Defendants cannot demonstrate either, their request for injunctive relief is denied.

## D. Filing of Counterclaims Was Not in "Bad Faith"

Aday requests that the Court find that Defendants' "claim of misappropriation" was "made in bad faith," and should therefore award him attorney fees pursuant to 18

29

U.S.C. § 1836(b)(3)(D). To do so, however, the Court must find that "the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997). Simply put, Aday has failed to point to any such evidence demonstrating that Defendants acted in bad faith or with improper purpose. Through the course of this litigation, Defendants came across certain emails which they believed contained protected trade secrets. After thoroughly investigating, Defendants sought leave to file its counterclaims more than six months after Aday filed the initial lawsuit. Here, even though these claims ultimately failed, they were based on legitimate grounds and were filed in order to protect Defendants' confidential and proprietary information. Accordingly, Aday's request is denied.

## III. Defendants' Motions to File Under Seal

The Sixth Circuit has held that a party seeking to seal or redact records has the heavy burden of overcoming the "strong presumption in favor of openness." *Shane Grpt., Inc. v. Blue Cross Blue Shield*, 825 F.3d 299, 305 (6th Cir. 2016) (*citing Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1180 (6th Cir. 1983)). "To meet this burden, the party must show the following: (1) a compelling interest in sealing the records; (2) that the interest in sealing outweighs the public's interest in accessing the records; and (3) that the request is narrowly tailored." *Kondash v. Kia Motors Am., Inc.*, 767 F. App'x 635, 637 (6th Cir. 2019). Generally, only "trade secrets, information covered by a recognized privilege, and information required by statute to be maintained in confidence" are compelling enough reasons to overcome this

presumption. *Shane Grp.*, 825 F.3d at 305. But the Sixth Circuit has also stated that "[t]he privacy interest of innocent third parties should weigh heavily in a court's balancing equation." *Id.*

In their first Motion to Seal (Doc. 63), Defendants seek to file under seal the four emails discussed in detail above. (*Supra* p. 24-8.) There is a compelling interest in sealing these documents because three of the four emails qualify as protected trade secrets under Ohio law, and the fourth contains information obtained through a paid subscription that is owned by an innocent third party. The interest in sealing these documents thus outweighs the public's interest in accessing them. The request is also narrowly tailored since Defendants only seek to file under seal these four emails. Accordingly, Defendants' first Motion to Seal (Doc. 63) is granted.

In their second Motion to Seal (Doc. 70), Defendants seek to file under seal the Zito Interview Notes. There is a compelling interest in sealing this document because it contains personal and private information of an innocent third-party, Curt Zito. Zito's interest in keeping this information private outweighs the public's interest in accessing it. And the request is narrowly tailored. Accordingly, Defendants second Motion to Seal (Doc. 70) is granted.

## CONCLUSION

In sum, Plaintiff's claims fail because he cannot prove that he was discriminated against based on his age. And, Defendants' counterclaims fail because Aday never actually "misappropriated" any trade secrets. Accordingly, the Court hereby orders:

1. Plaintiff's motion for summary judgment as to Defendants' counterclaims

for (1) misappropriation or theft of trade secrets under Ohio and federal law, and (2) breach of duty of good faith and loyalty under Ohio law (Doc. 58) is **GRANTED**;

      2.      Defendants' motion for summary judgment as to Plaintiff's claims for (1) age discrimination under Ohio and federal law, and (2) retaliation under Ohio and federal law (Doc. 59) is **GRANTED**;

      3.      Defendants' motion to file under seal the four emails attached as exhibits to the affidavit of Michael Rossander (Doc. 63) is **GRANTED**;

      4.      Defendants' motion to file under seal the Zito Interview Notes (Doc. 70) is **GRANTED**;

      5.      Magistrate Judge Karen L. Litkovitz's Order to temporarily file under seal (Doc. 38) is **ADOPTED** in its entirety and Defendant's motion to file under seal (Doc. 36) is therefore **GRANTED**; and

      6.      This case be closed on the docket of this Court.

**IT IS SO ORDERED.**

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO

By: _____

                    JUDGE MATTHEW W. McFARLAND